UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ZACHRY INDUSTRIAL, INC.                                                    Plaintiff

v.                                                            Civil Action No. 3:18-cv-579

SIEMENS ENERGY, INC. AND BABCOCK                              Defendants
POWER ENVIRONMENTAL, INC.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendants move for summary judgment.  [DE 70; DE 71].  Briefing is complete, and the

motions are ripe.  [DE 79; DE 80; DE 83; DE 84].  For the reasons below, the Court **GRANTS IN**

**PART, DENIES IN PART** Defendant Siemens Energy, Inc's ("Siemens") Motion for Summary

Judgment [DE 70] and **GRANTS IN PART, DENIES IN PART** Defendant Babcock Power

Environmental, Inc.'s ("Babcock")  Motion for Summary Judgment [DE 71].

## I.      BACKGROUND

In 2012, Zachry Industrial, Inc. ("Zachry") began an "engineering, procurement and

construction project" (the "Project") for the Louisville Gas and Electric Company ("LG&E").  [DE

1-2 at 13].  One of the Project's goals was to modernize "emissions controls and equipment" to

"reduce emissions of power generating facilities" at LG&E's Mill Creek Station (the "Premises")

in Louisville, Kentucky.  *Id.*   In April 2012, LG&E and Babcock entered into an Equipment

Purchase Agreement ("Purchase Agreement"), in which Babcock agreed to provide LG&E with

six oxidization air blowers ("Air Blowers") by October 14, 2016.  [DE 71 at 449].  As part of the

Purchase Agreement, Babcock also agreed to "provide technical assistance, expert guidance and

direction, including Job Site Field Services to Buyer during delivery, receipt, installation,

1

commissioning, and testing of the [Air Blowers], so as to ensure the [Air Blowers] become[] fully operational in accordance with the requirements of this Agreement."  [DE 79-4 at 921].  Babcock contracted with Siemens (the "Air Blower Agreement") for Siemens "to design, manufacturer [sic] and provide the component parts/equipment needed" for the Project.  [DE 71 at 449].

In March 2013, Zachry and LG&E entered into an Amended and Restated Engineering, Procurement and Construction Agreement ("EPC Agreement").  [DE 79-3 at 884].  As part of the EPC Agreement, LG&E and Zachry agreed that:

> Contemporaneously with the execution of this Agreement, the Parties shall execute assignment agreements substantially in the form attached hereto as Exhibit Z under which, effective as of the Effective Date, Owner shall assign to Contractor all of its right, and interest in and to the AQCS Equipment Contracts and Contractor shall assume all of Owner's obligations under the AQCS Equipment Contracts.

*Id.* at 805.

As defined in the EPC Agreement, LG&E was the "Owner" and Zachry was the "Contractor."  *Id.* at 784.

In June 2016, one of the Siemens' Air Blowers ("3A Air Blower") was installed on the Premises.  [DE 71 at 450].  Babcock bought the 3A Air Blower as part of its Purchase Contract with LG&E.  On August 4, 2016, the Premises "experienced an inadvertent shutdown" of its uninterruptable power supply ("UPS")  [DE 1-2 at 14].  The parties do not appear to dispute that an LG&E employee caused the "shutdown"  when he "'leaned up' against the UPS panel and accidently pressed two buttons simultaneously, causing the UPS system to cut power to crucial equipment."  [DE 71 at 449-50].  As a result of the LG&E employee's actions, "the 3A Oxidation Air Blower did not shut down, creating a surge condition that ignited a fire in the intake air duct of the 3A Oxidation Air Blower" and caused "extensive fire and mechanical damage" to the 3A Air Blower.   [DE 1-2 at 14].

After the fire, one of Zachry's insurers retained a consulting firm to "review the control system design and implementation" of the 3A Air Blower and to "investigate the cause of the control system's failure to shut the blower down prior to it sustaining the extensive damage that occurred." [DE 79-8 at 1010]. In preparing its report, the consulting firm met with Siemens and Zachry representatives, visited the Siemens facility, and reviewed more than 800 pages of "documents consisting of damage assessment reports, control schematics, one-line diagrams, operating procures, ladder logic charts, event logs and functional descriptions." *Id.* at 1012. The consulting firm also had "numerous discussions with [Babcock representatives] regarding the control system design." *Id.* The consulting firm issued its report (the "Report") on November 4, 2016.[1] *Id.* at 1009. The consulting firm determined that:

1. There was an inadvertent shutdown of the plant Uninterruptable Power Supply (UPS). The UPS supplies power to both the 3A Oxidation Air Blower Programmable Logic Controller (PLC) and the control power for the six (6) Oxidation Air blower lance vales.

2. According to [Babcock], the Oxidation Air Lance Valves were designed to remain open during normal unit operation and to "fail in place" in the event of power loss. This is consistent with [the consulting firm's] review of the documentation and discussions with the insured. However, it appears that a DCS macro was incorrectly programmed to cause the six Oxidation Air lance valves to fail closed upon loss of power. This event created a surge condition that precipitated the damages that occurred to the blower . . . Surging can cause the compressor to overheat to the point at which the maximum allowable temperature of the unit is exceeded. Even though this is an undesirable condition it is not uncommon and needs to be accounted for in the control system design.

3. Upon loss of control power, the blower unit did not shut down. This contradicts industry practice for a fail safe operation as well as the Siemens Operation Description.

4. A Higher Compressor Vibration condition was logged by the Historian system. This indicated a mechanical instability situation with the blower.

---

[1] Neither Siemens nor Babcock discuss the contents of the Report in their briefs.

. . .

1.  The proximate cause of the loss is a failure of the Oxidation Air Blower control system to shut the unit down during a trip condition.

2.  The control system design and field Implementation for Oxidation Air Blowers 3A & 3B [should] be reviewed by Siemens, [Babcock], Zachry and LG&E in order to confirm that in the future the control system will shut the blower unit down during a trip condition, including a loss of control power.  In particular, the issue of the "normally closed" contact mentioned by [Babcock] should be investigated further to determine if this feature was implemented intentionally or if it was wired in the motor circuit inadvertently.

*Id.* at 1013-15.

In February 2017, Babcock purchased a replacement air blower (the "Replacement Blower") from Siemens and provided it to Zachry.  [DE 71 at 450].  Babcock charged Zachry $661,893 for the Replacement Blower.  *Id.*  Zachry filed a claim with its insurers.  [DE 70-1 at 304].  In the claim, Zachry requested a payment of $253,513.99 for "internal/direct damages" related to the fire and $661,893.00 for the Replacement Blower for a total claim of $915,406.99.  [DE 71 at 450].  Zachry's insurers paid its full claim, and Zachry retained the entire amount of the claim.  *Id.* at 451.  Zachry has not paid Babcock for the Replacement Blower.  [DE 70-1 at 303].

In February 2018, Zachry and its insurers signed a Joint Prosecution Agreement ("JPA").  [DE 79 at 1371].  In the JPA, the parties agreed how they would divide the recovery in a suit against "Siemens and/or their insurers and any other party determined to be responsible for damage."  [DE 79-5 at 972].  Under the JPA, Zachry would only be entitled to $250,000, which is the cost of its insurance deductible.  *Id.*  The remainder of the $915,406.99 would be divided among the insurers.  *Id.* The parties agreed that Clausen Miller P.C. would represent the subrogation

interests of three of the four insurers.[2]  *Id.*  They also agreed that Clausen Miller P.C. would represent  Zachry's interest in its insurance deductible.  *Id.*

On August 2, 2018, Zachry sued in Jefferson County Circuit Court.  [DE 1-2 at 12]. Although the firm of Kolb, Clare & Arnold filed the suit, Clausen Miller P.C. is listed as "of counsel" on the Complaint.  *Id.* at 22.  Siemens removed the case to this Court based on diversity. [DE 1 at 1].   In its Complaint, Zachry asserts state-law claims against Defendants for negligence, breach of contract, breach of express and implied warranties, and strict products liability.  [DE 1-2 at 15-21].

## II.    STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion."  *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  The Court must view the evidence and draw all reasonable inferences in a light most

---

[2] The firm of Bruckmann & Victory would represent the remaining insurer's subrogation interest.  [DE 79-5 at 972].

favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

## III.    DISCUSSION

### A. Arguments Made by Both Siemens and Babcock

1. <u>Standing and Real Party in Interest</u>

Defendants argue that the Court lacks Article III jurisdiction over Zachry's claims because Zachry lacks standing to bring it. [DE 70-1 at 305; DE 71 at 453-54]. Defendants also argue that Zachry's insurers, not Zachry, are the real parties in interest in this case. [DE 70-1 at 306-07; DE 71 at 454-56]. Zachry counters that it has "an interest in this litigation to the extent" of the $250,000 deductible it paid to its insurers. [DE 79 at 1371]. Zachry also asserts that the "remaining proceeds related to the instant lawsuit, if any, are distributable to Zachry's insurers in accordance with the allocation outlined in the JPA. Therefore, Siemens' primary argument that Zachry has already been 'redressed' for its injuries is simply incorrect." *Id.*

"Frequently, attorneys and courts confuse the concepts of standing with that of capacity to sue and with the real party in interest principle." *Firestone v. Galbreath,* 976 F.2d 279, 283 (6th Cir.1992). "The determination of whether a plaintiff has standing requires a court to evaluate

whether and to what degree the party has personally suffered harm or threatened harm, whether that harm or threatened harm can be fairly traced to the defendant's alleged illegal conduct, and whether the plaintiff's alleged harm is likely to be redressed by the relief he requests." *City Commc'ns, Inc. v. City of Detroit,* 888 F.2d 1081, 1086 (6th Cir.1989). Zachry has standing because: 1) it "suffered harm" by having to pay a $250,000 deductible; 2) the "harm can be fairly traced to defendant[s'] alleged illegal conduct" because, but-for the damage sustained to the 3A Air Blower, Zachry would not have paid its $250,000 deductible; and 3) recovering the $250,000 from Defendants would "redress" the harm that Zachry alleges that they caused.

"The real party in interest principle is related to, but different than the concept of standing." *JSC Terminal, LLC v. Farris*, No. 5:10CV00040-R, 2010 WL 2178512, at *2 (W.D. Ky. May 27, 2010). Federal Rule of Civil Procedure 17(a) provides that "[a]n action must be prosecuted in the name of the real party in interest." "[T]he real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters v. Layne,* 26 F.3d 39, 42–43 (6th Cir. 1994). "The real party in interest analysis turns upon whether the substantive law creating the right being sued upon affords the party bringing the suit a substantive right to relief." *Id.* at 43. In diversity actions, like this one, "the governing substantive law for determining the real party in interest is state law." *Aus-Tex Expl., Inc. v. Res. Energy Techs., LLC*, 646 F. Supp. 2d 874, 881–82 (W.D. Ky. 2009) (applying Kentucky law) (internal quotation marks and citations omitted).

Zachry asserts that it is the real party in interest as to the $250,000 deductible it paid as part of its insurance claim for the cost of the Replacement Blower. [DE 79 at 1371]. In Kentucky, a party has an interest in its insurance deductible:

> The pleadings raised the question of whether the Mack corporation was the real party in interest, by reason of the fact that all of the damage to the truck-tractor, in excess of $100, had been paid to the Mack corporation by the Employers' Fire Insurance Company, under a $100-deductible collision insurance policy, and the Mack corporation had made an assignment to the insurance company. The railroad company maintains that the written assignment actually assigned to the insurance company the entire cause of action of the Mack corporation; however, construing the language of the assignment as a whole, and taking it with the terms of the insurance policy, we think that the assignment was not intended to include the Mack corporation's cause of action for the first $100 of the loss, which the insurance company did not pay.

*Louisville & N. R. Co. v. Mack Mfg. Corp.*, 269 S.W.2d 707, 708 (Ky. 1954); *see Factory Mut. Ins. Co. v. Derby Indus., LLC*, No. 3:17-CV-00198-JHM, 2018 WL 4390745, at *4 (W.D. Ky. Sept. 14, 2018) ("In the present case, it is clear that prior to the assignment in question, the only party entitled to sue for the $6 million deductible was GE. Factory Mutual did not pay GE the full $140 million that corresponded with GE's loss, but rather only $134 million").

But, as Babcock sees it, the definition of "Contractor Expense" in the EPC Agreement precludes Zachry from seeking damages for its deductible:

> "Contractor Expense" shall mean an expense or cost of Contractor's performance hereunder for the sole responsibility of Contractor and is not to be reimbursed as a Reimbursable Expense . . . Contractor Expense shall include, any expense or cost associated with . . . (xiv) any and all losses and other costs and expenses incurred with respect to occurrences against which Contractor is required to maintain insurance policies pursuant to Article 21, up to the required limits of such policies as set forth in Exhibit I (including any deductibles and self-insured retentions under such policies.

[DE 83 at 1418 (citing DE 79-3 at 788-89)].

"Reimbursable Expenses" include "any and all reasonable expense associated with Contractor's Work," but exclude "Contractor Expense." *Id.* at 800. While it may be true that LG&E need not reimburse Zachry for its deductible because it is a "Contractor Expense," the Court

declines to find as a matter of law that this provision in the EPC Agreement precludes Zachry from suing Defendants for it.

Although Zachry asserts that it has an interest in the deductible, it concedes that the insurers listed in the JPA are the real parties in interest as to the remaining $665,406.99 sought in the suit. [DE 79 at 1371].  And Zachry does not argue that the JPA constitutes an assignment.  *See Mack*, 269 S.W.2d at 709 ("[T]he real party in interest is the person who is the beneficial owner of the cause of action sought to be prosecuted. Where the cause of action is assignable, and the entire cause has been assigned, clearly the assignee has become the owner of the cause and he is the real party in interest").   Nor does Zachry argue that its insurers ratified the filing of this suit.  Although Zachry filed its Complaint in August 2018, Babcock appears to have first objected to Zachry's failure to add the remaining real parties of interest in late February of this year.  [DE 1-2 at 12; DE 69 at 279; DE 71 at 456].

"The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed.R.Civ.P. 17(a)(3).  Generally, "'[a] Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants.'" *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 534 (6th Cir. 2002) (Gilman, J., concurring) (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 20 (2d Cir.1997)).

Because the parties have been litigating this issue in their pleadings since then without a ruling from the Court on it, the Court finds it is reasonable to allow Zachry fourteen days to ratify, join, or substitute the remaining parties in interest or to show cause why doing so is not required under Fed.R.Civ.P. 17(a)(3).

2. Double Recovery

Defendants also argue that Zachry's claims should be dismissed because it seeks double recovery. [DE 70-1 at 306; DE 71 at 456]. Referencing the JPA, Zachry counters: "While Siemens is correct that Zachry's insurers are real parties in interest to this case to the extent of their payment to Zachry, Siemens' fails to recognize that Zachry itself also has an interest in this litigation to the extent of its deductible." [DE 80 at 1404].

"There is a strong public policy in this Commonwealth against double recovery for the same elements of loss. An exception, of course, is the collateral source rule that damages recoverable for a wrong are not diminished by the fact that the injured party has been wholly or partly indemnified by insurance (to whose procurement the wrongdoer did not contribute)." *Hardaway Mgmt. Co. v. Southerland*, 977 S.W.2d 910, 918 (Ky.1998) (internal quotation marks, formatting, and citations omitted). Because Zachry's insurers did not reimburse it for its $250,000 deductible, the Court cannot find that Zachry is seeking a double recovery.

3. Economic Loss Doctrine

Defendants contend that Zachry's claims are barred under the economic loss doctrine. [DE 70-1 at 311; DE 71 at 460-63]. Under Kentucky law, "[t]he parties' allocation of risk by contract should control without disturbance by the courts via product liability theories borne of a public policy interest in protecting people and their property from a dangerous product." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 738 (Ky. 2011). As a result, "costs for repair or replacement of the product itself, lost profits and similar economic losses cannot be recovered pursuant to negligence or strict liability theories but are recoverable only under the parties' contract, including any express or implied warranties." *Id.* But, "[l]osses for injuries to people and to 'other property,' in these commercial transactions, remain subject to the traditional product

liability theories. This holding is entirely consistent with the latest Restatement of Torts which allows the buyer of a defective product to recover in tort for injuries to persons or other property but not for economic losses." *Id.*

Babcock argues that Zachry should not be allowed to recover for "damage to 'other property' caused by the subject fire" because Babcock and Zachry were "'sophisticated commercial entities of equivalent bargaining power,'" the damage to the "other property" caused by the subject fire was fully within the "'contemplation of the parties,'" and because Zachry alleges, "but has not proven, that some siding to the 'blower house' and enclosure was damaged." [DE 71 at 462-63 (quoting *Detroit Edison Co. v. NABCO, Inc*., 35 F.3d 236, 241-42 (6th Cir. 1994)]. In *NABCO*, the Sixth Circuit, interpreting Michigan law, held that "tort claims for damage to other property are barred by the economic loss doctrine if those losses are direct and consequential losses that were within the contemplation of the parties and that, therefore, could have been the subject of negotiations between the parties." *Id.* at 241. But, in *Giddings*, the Kentucky Supreme Court took a more expansive view of when buyers in commercial transactions can seek damages related to "other property." *Giddings*, 348 S.W.3d at 738 ("Losses for injuries to people and to 'other property,' in these commercial transactions, remain subject to the traditional product liability theories"). Ultimately, *NABCO* does not control here because its holding appears to conflict with current Kentucky law.

In the Purchase Agreement, Babcock warranted to Zachry that:

[E]ach item of Equipment and Materials furnished under this Agreement shall in all material respects: (i) be free from errors, defects or damage in design, materials, and workmanship; (ii) be new; (iii) be of good quality and good condition; (iv) be delivered, handled, stored (whether on the Job Site or off of the Job Site) in accordance with manufacturers' and/or Subcontractors' instructions and requirements; (v) conform to Project Requirements; and (vi) not be subject to excess corrosion and erosion (e.g., any material thickness diminishes below its

11

design minimum wall requirement without regard to the size of the area) (collectively, "Warranties"). WFGD Supplier further warrants that all Work shall be performed in a competent, diligent manner in accordance with Professional Standards and shall conform in all material respects with the requirements of this Agreement and all Applicable Law, Codes and Standards and Permits in effect as of the date of the performance of the Work.

[DE 79-4 at 944].

In the "WFGD Supplier Caused Damage" provision of the Purchase Agreement,

Babcock also promised:

To the extent that any physical damage or loss to the WFGD, the Unit or any portion thereof, the Existing Facilities, other work being performed by Buyer, or any other portions of, or any betterments, equipment or other property located at, the Generating Station Site either (i) is caused by WFGD Supplier or its Subcontractors arising out of the performance of the Work (including any warranty Work) or (ii) results prior to or during the Warranty Period from any Defect, WFGD Supplier shall be liable for making payment to Owner for the cost to repair, correct, or replace such damage or loss. WFGD Supplier's liability for such damage or loss shall not exceed $2,500,000 per occurrence.

*Id.* at 969-70.

Moreover, Zachry's corporate representative testified during his deposition about the

extent of the damage to the "other property":

Q. That's right. Damage other than to the blower itself, so the blower, I know, was kind of burned up and replaced –

A. Yeah.

Q. – replaced by Siemens. Do you know – you, you mentioned some – I think there's some reference in the documents to some siding damage. Can you describe that in more detail?

A. For the enclosure. Yeah, I mean the, the blower is in an enclosed space, and so the fire was not contained to the blower housing. It, it damaged the enclosure as well.

Q. So the, kind of a component parts of the housing of the blower was damaged?

A. Yes.

12

Q.  Anything else?

A.  Well, the – I mean, the enclosure is the building around it. It would be like the walls of this –

Q.  Right.

A.  – this room. There was some control work for, for an elevator system. There were incidental components outside of the, outside of the blower that, that would have been damaged. I don't have a, I don't have a complete list, but it would be spelled out in our, in our proof of loss documentation.

[DE 71-1 at 517].

Based on the record before the Court, the Court cannot find as a matter of law that Zachry is precluded from seeking recovery for "other property" damaged in the fire.  *See Bowling Green Mun. Utilities v. Thomasson Lumber Co.*, 902 F. Supp. 134, 139 (W.D. Ky. 1995)  (finding that plaintiff could "recover in tort . . . anything other than the poles themselves. This definition includes any property owned by Plaintiff that a defective pole proximately harmed, including any items attached to the poles by Plaintiff or a company other than either Defendant").

4. <u>Statute of Limitations</u>

Defendants argue that Zachry's product liability claims brought under negligence and strict liability theories are barred by the applicable one-year statute of limitations.  [DE 70-1 at 312; DE 71 at 458-60].  Citing KRS § 413.125,[3]  Zachry argues that a two-year statute of limitations governs its negligence claim because the claim "sounds" in "personal property," not "personal injury."

---

[3]  KRS § 413.125 provides that "[a]n action for the taking, detaining or injuring of personal property, including an action for specific recovery shall be commenced within two (2) years from the time the cause of action accrued"

[DE 79 at 1372].  Zachry does not respond to Defendants' argument that its strict liability claim is barred by the applicable one-year statute of limitations.

In Kentucky, "there are three different theories of liability for personal injury or property damage available against the manufacturer or commercial seller which may or may not be available to the injured party, depending on the factual circumstances." *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985).  They are: 1) "ordinary negligence"; 2) "strict liability in tort"; and 3) "contract liability for breach of warranty, which is governed by the terms of the contract and the statutory provisions of the U.C.C." *Id.*  Under Kentucky law, "product liability actions are governed by the Kentucky Product Liability Act ("KPLA"). *Prather v. Abbott Labs.*, 960 F. Supp. 2d 700, 705 (W.D. Ky. 2013).  The KPLA governs "all damage claims arising from the use of products, regardless of the legal theory advanced." *Mitchell v. Actavis Pharms.*, 185 F. Supp. 3d 971, 974 (W.D. Ky. 2016) (quoting *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997)). The Act applies "regardless of whether the action is founded on strict liability in tort, negligence or breach of warranty.  While each of these theories of recovery in products liability cases requires proof of different elements and has different implications their central purpose is the same: recovery of damages for injury or property damage caused by a product." *Monsanto*, 950 S.W.2d at 814  (internal citation omitted).

The elements of a negligent product liability claim are: 1) duty; 2) breach; 3) and damages proximately caused by the breach.  *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 747 (W.D. Ky. 2013).  Zachry's negligence claim stems from Defendants' alleged failure to properly design, manufacture, program, and inspect the 3A Air Blower.  [DE 1-2 at 15-16]; *see* KRS § 411.300 (defining a product liability action as "any brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation,

development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, advertising, packaging or labeling of any product"). Based on the allegations in its Complaint, Zachry has pled the elements for a negligent products liability claim. [DE 1-2 at 15-16]. In Kentucky, product liability claims, whether based on negligence or strict liability, are governed by KRS § 413.140(1)'s one-year statute of limitations. *See Mills v. Johnson & Johnson*, No. CV 6:19-248-KKC, 2021 WL 1062541, at *5 (E.D. Ky. Mar. 19, 2021); *Richardson v. Rose Transp., Inc.*, 617 F. App'x 480, 484 (6th Cir. 2015); *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010), *Hogan v. Goodrich Corp.*, No. CIV. A. 05-159-C, 2006 WL 149011, at *4 (W.D. Ky. Jan. 17, 2006), *on reconsideration in part*, No. CIV.A. 05-159-C, 2006 WL 2056681 (W.D. Ky. May 16, 2006). Zachry has not cited and the Court has found no cases in which courts have applied KRS § 413.125's two-year statute of limitations to a negligent product liability claim. Zachry does not dispute that its injury occurred on August 6, 2016 and that it filed its Complaint more than two years later. Because Zachry filed its claims for negligence product liability and strict liability outside the one-year statute of limitations, those claims are time-barred and will be dismissed.

That said, Zachry is correct that a four-year statute of limitations governs its product liability claim brought under a breach of warranty theory. *See Fulmer*, 695 S.W.2d at 412 (recognizing that "in proper circumstances the victim of a defective product can pursue a products liability claim under the breach of warranty theory, and that breach of warranty carries with it a four year statute of limitations"). Privity of contract is an element of a breach of warranty claim. *See Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 778 (E.D. Ky. 2017). Zachry and Babcock have privity of contract because LG&E assigned the Purchase Agreement to Zachry.

*See Williams v. Volvo–White*, 2003 WL 22681457 at *3 (Ky.App. Nov.14, 2003)  (holding that a subsequent purchaser could have privity of contract with the defendant seller where agreement existed as to various terms of warranties and an assignment of rights occurred).  As discussed below in more detail, Zachry, a third-party beneficiary of the Air Blower Agreement, has privity of contract with Siemens.  As a result, its product liability claim brought under a theory of breach of warranty is not time-barred because it was filed within the applicable four-year statute of limitations.

      6.  <u>Waiver of Subrogation</u>

Defendants assert that Zachry's claims must be dismissed because they are barred by the waiver of subrogation provision in the Purchase Agreement.  [DE 70-1 at 312-13; DE 71 at 456-57].  Zachry argues that this provision does not bar its claims because its insurance policies "contain no mention of waiver of the insurer's subrogation rights."  [DE 79 at 1372].

Article XIV of the Purchase Agreement provides:

> WFGD Supplier (and its Subcontractors) shall provide and maintain the insurance specified in Exhibit I (Insurance) in accordance with the terms and provisions thereof. Buyer shall cause the issuer of any all risk builder's risk insurance policy pursuant to which it obtains coverage in connection with the Prime Contract to name WFGD Supplier as an additional insured and waive rights of subrogation against WFGD Supplier. Owner shall cause the issuer of its property insurance policy pursuant to which it obtains coverage on the Existing Facility to waive rights of subrogation against WFGD Supplier.

[DE 70-4 at 430].

This provision does not state that Zachry has waived its subrogation rights against Babcock and Siemens.  Rather, the provision appears to require Zachry to modify any of its insurance policies to do so.   But, based on the factual record before the Court, it is unclear to the Court whether Zachry in fact modified its insurance policies to waive the right of subrogation against

Babcock and Siemens.  *See Employers Mut. Liab. Ins. Co. of Wis. v. Griffin Const. Co.*, 280 S.W.2d 179, 181 (1955)  ("The insurer's right of subrogation against third persons causing the loss . . . paid by the insurer to the insured does not rest upon any relation of contract or privity between the insurer and such third person, but arises out of the contract of insurance and is derived from the insured alone").  As a result, the Court cannot find as a matter of law that this provision bars Zachry's claims.

## B. Arguments Made by Siemens

### 1. Provisions in the Air Blower Agreement

Siemens argues that Section 14(f) and Section 16(d) of the Air Blower Agreement precludes Zachry's claims and damages.  [DE 70-1 at 310-12].  Section 14(f) provides:

> This warranty, including stated remedies, is expressly made by Seller and accepted by Buyer in lieu of all other warranties, and Seller expressly disclaims any implied warranty of merchantability or fitness for any particular purpose.

[DE 70-3 at 342].

Section 16(d) provides:

> Buyer expressly agrees that neither Seller nor its suppliers will under any circumstances be liable under any theory of recovery, whether based in contract, in tort (including negligence and strict liability), under warranty, or otherwise, for any special, indirect, incidental or consequential loss or damage whatsoever; damage to or any loss of property or equipment . . . or any claims of customers of purchaser. Buyer expressly agrees that the remedies provided it in the agreement are exclusive and under no circumstances shall the total aggregate liability of Seller under any theory of recovery, whether based in contract, in tort (including negligence and strict liability), under warranty, or otherwise, exceed the total price paid to Seller under the agreement.

*Id.* at 344.

"[T]he general rule is that a third party beneficiary asserting rights under the contract is subject to any defense that the promisor would have against the promisee." *Ping v. Beverly*

*Enterprises, Inc.*, 376 S.W.3d 581, 596 (Ky. 2012) (citing *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370 (1984)).  But, "the general rule that the promisor may assert against the beneficiary any defense that it could assert against the promisee if the promisee were suing on the contract is inapplicable when the language of the contract, or the circumstances under which it was executed, establishes that the parties have provided that the right of the beneficiary is not to be affected by any defenses that the promisor might have against the promisee." *Schneider*, 466 U.S. at 371.

The Air Blower Agreement references the different parties using generic terms.  In the Air Blower Agreement, "Seller" is Siemens, "Buyer" is Babcock, "Owner," appears to be either LG&E or Zachry, and the "Owner's engineer" and "EPC contractor" appears to be Zachry.  [DE 70-3 at 340].  The Blower Agreement states that "Owner and its EPC contractor shall have to the right to enforce all guarantees and warranties under this Purchase Owner [sic]." *Id.* at 342.  Despite the use of "Owner," "Owner's engineer," and "EPC contractor" throughout the Air Blower Agreement, Section 14(f) and Section 16(a) refer only to the "Seller" and the "Buyer." Based on the language of the Air Blower Agreement and the circumstances under which it was executed, the Court cannot find as a matter of law that Section 14(f) and Section 16(a) preclude Zachry's claims.  The Court also declines to find that "customers of purchaser" refers to Zachry, as it is unclear whether "purchaser" refers to Babcock purchasing from Siemens or Zachry purchasing from Babcock.  That said, because Babcock is referenced as "Buyer" earlier in that section, it seems unlikely that the use of "purchaser" later on refers to it.

**B. Arguments Made by Babcock**

1. Product Liability Claims: No Evidence of Causation

Babcock argues that Zachry has "provided no evidence, and certainly no expert testimony, that Babcock's acts or omissions caused or contributed [sic] the fire." [DE 71 at 463]. Babcock also argues that, in "addition to Zachry being unable to establish that [it] was the cause" of Zachry's injuries, the actions of the LG&E employee are "an undisputed superseding cause cutting off any potential liability to Babcock." *Id.* at 464. Citing the Report, Zachry counters that "the Oxidation Air Blower System failed to shut down the unit during a 'trip,' a function the system was *supposed* to be designed to perform. Because the shutdown function was a design component of the Oxidation Air Blower System, it cannot be argued that an event triggering such an emergency shutdown was not foreseeable." [DE 79 at 1375-76 (emphasis in original)].

In Kentucky, a plaintiff pursuing claims for strict liability, negligence, or breach of warranty bears the burden of establishing that the product was the factual and legal cause of its injuries. *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995). "Further, under Kentucky law, causation or proximate cause is defined by the substantial factor test: was the defendant's conduct a substantial factor in bringing out plaintiff's harm?" *Id.* A plaintiff may prove causation by circumstantial evidence, but "the evidence must be sufficient to tilt the balance from possibility to probability." *Id.* (internal quotation marks and citation omitted).

Under the Purchase Agreement, Babcock was responsible for "provid[ing] technical assistance, expert guidance and direction, including Job Site Field Services to Buyer during delivery, receipt, installation, commissioning, and testing of the [Air Blowers], so as to ensure the [Air Blowers] becomes fully operational in accordance with the requirements of this Agreement." [DE 80-4 at 1228]. The Report noted that:

19

> 2.   According to [Babcock], the Oxidation Air Lance Valves were designed to remain open during normal unit operation and to "fail in place" in the event of power loss.   This is consistent with [the consulting firm's] review of the documentation and discussions with the insured.   However, it appears that a DCS macro was incorrectly programmed to cause the six Oxidation Air lance values to fail closed upon loss of power.   This event created a surge condition that precipitated the damages that occurred to the blower . . . Surging can cause the compressor to overheat to the point at which the maximum allowable temperature of the unit is exceeded.   Even though this is an undesirable condition, it is not uncommon and needs to be accounted for in the control system design.

[DE 79-8 at 1012-13].

The Report noted that the "issue of the 'normally closed' contact mentioned by [Babcock] should be investigated further to determine if this feature was implemented intentionally or if it was wired in the motor circuit inadvertently." *Id.* at 1015.   Based on the Report, the Court finds that there is a genuine issue of material fact about whether Babcock's actions or inactions in installing, commissioning, and testing the Air Blowers resulted in the 3A Air Blower to "fail closed." As to Babcock's argument that the LGE employee was a superseding cause, a superseding cause "must not have been reasonably foreseeable by the original actor." *Howard v. Spradlin*, 562 S.W.3d 281, 288 (Ky. Ct. App. 2018).   The Report discusses "how [Babcock] cites the unintentional shutdown of the UPS and the compressor surge as the root cause of the loss." [DE 79-8 at 1014].   The Report finds that "[e]ven though a power outage and compressor surge are undesirable events they are not common.   The control system should account for these anomalies in design and implementation." *Id.*   Based on the Report, there is a genuine issue of material fact about whether the "power outage and compressor surge" were "reasonably foreseeable" to Babcock.

### 2.   Breach of Contract Claim: Breach and Damages

Babcock contends that Zachry "cannot demonstrate a breach in its breach of contract

20

claim" because "the essence of the [Purchase Agreement]" was that Babcock would supply Zachry with Air Blowers, which it did.   [DE 71 at 465].  Zachry asserts that "Defendants' breaches of the Contract include, but are not limited to, breach of the agreement to remain liable for all losses caused by the negligent acts or omissions of Defendants' employees, and breach of the agreement to provide work, materials and equipment free from defects."  [DE 79-2 at 771].  The Purchase Agreement provides, among other things, that Babcock shall provide Zachry with "materials" and "workmanship" free from "errors, defect, or damage."  [DE 79-4 at 944].  The Court has found that there is a genuine issue of material fact about whether Babcock is the proximate cause of the damage to the 3A Air Blower.  As a result, there is a genuine issue of material fact about whether Babcock breached the Purchase Agreement by providing a defective Air Blower or defective "workmanship."

Babcock also argues that Zachry's claim must also fail because Zachry has suffered no damages.  [DE 71 at 466 ("Zachry received a replacement OA blower to account for the loss to Unit 3A.  In addition, Zachry received a large pay out from its insurance carrier, which resulted in a profit of $300,791.00. At this time, Zachry has no actual damages to support its breach of contract action").   As discussed above, the Court has found that Zachry's deductible constitutes its damages.

3. Breach of Express and Implied Warrant Claim: Breach

Babcock argues that Zachry's claim for express or implied warranty must fail for three reasons.  First, "there is no proof of proximate cause."  [DE 71 at 467].  Second, "the unforeseeable human error of an LG&E employee caused the UPS to enter stand-by mode. Without that error, the fire that led to loss of the equipment would not have occurred."  *Id.*  Third, the "middle-man" statute shields Babcock from liability because "installation of the [Air Blowers] was completed by

Zachry," "there is no evidence or allegation that any of the equipment was altered by Babcock before the equipment reach Zachry," and "there is no evidence that Babcock had knowledge that the [Air Blowers] had any defects in the event that there is a power surge." *Id.* at 468.

As to the first two reasons, the Court has found that there is a genuine issue of material fact about these issues. As to the third reason, Kentucky's "middle-man statute" provides:

> In any product liability action, if the manufacturer is identified and subject to the jurisdiction of the court, a wholesaler, distributor, or retailer who distributes or sells a product, upon his showing by a preponderance of the evidence that said product was sold by him in its original manufactured condition or package, **or in the same condition such product was in when received by said wholesaler, distributor or retailer**, shall not be liable to the plaintiff for damages arising solely from the distribution or sale of such product, unless such wholesaler, distributor or retailer, breached an express warranty or knew or should have known at the time of distribution or sale of such product that the product was in a defective condition, unreasonably dangerous to the user or consumer.

KRS 411.340(1) (emphasis added).

"[N]otwithstanding the 'middleman' provisions of the Kentucky Product Liability Act, a wholesaler, distributor or retailer may be liable if it: (1) breaches an express warranty, or (2) knew or should have known at the time of distribution that the product was in a defective condition, unreasonably dangerous to the user." *West v. KKI, LLC*, 300 S.W.3d 184, 192 (Ky. Ct. App. 2008). Zachry argues that "Babcock breached its express warranty to Zachry that the above-referenced equipment, including the Air Oxidation System, was 'free from errors, defects or damage,' a promise that Zachry relied upon when purchasing said equipment. Therefore, the 'middleman statute' does not apply to shield Babcock from liability." [DE 79 at 1378-79]. There is a genuine issue of material fact about whether the 3A Air Blower was "defective." [*See* DE 79-8 at 1009-16]. As a result, there is a genuine issue of material fact about whether Babcock breached its express warranty to Zachry by selling it the 3A Air Blower.

Babcock was also responsible for "provid[ing] technical assistance, expert guidance and direction, including Job Site Field Services to Buyer during delivery, receipt, installation, commissioning, and testing of the [Air Blowers], so as to ensure the [Air Blowers] becomes fully operational in accordance with the requirements of this Agreement." [DE 80-4 at 1228]. Based on the Report, it is unclear whether Babcock, as part of providing "Job Site Field Services," modified the Air Blowers after receiving them by "incorrectly programming" the DCS macro. [*See* DE 79-8 at 1012 ("According to [Babcock], the Oxidation Air Lance Valves were designed to remain open during normal unit operation and to "fail in place" in the event of power loss . . . However, it appears that a DCS macro was incorrectly programmed to cause the six Oxidation Air lance valves to fail closed upon loss of power"). There is a genuine issue of material fact about whether these modified Air Blowers were in the "same condition" after they were modified as when Babcock received them. *See Guilkey v. Com. Truck & Van Equip., Inc.*, No. CV 18-50-DLB-CJS, 2021 WL 1093623, at *4 (E.D. Ky. Mar. 22, 2021) ("Commercial has not identified a case where a court afforded middleman status to a seller who changed a product's condition contemporaneously with its distribution. In fact, at least one court has rejected a distributor's middleman defense where the evidence showed that the buyer had requested modifications to the product prior to delivery"). For these reasons, the Court cannot find as a matter of law that the "middle-man statute" shields Babcock from liability.

## C.    Arguments Made by Siemens

### 1. Lack of Privity

Siemens argues that Zachry's breach of contract and breach of warranty claims against it must be dismissed because it is not in privity of contract with Zachry. [DE 70-1 at 307-09]. Zachry

asserts it has privity of contract with Siemens because it is a third-party beneficiary of the Air Blower Agreement.  [DE 1-2 at 17].

Under Kentucky law, "no stranger to a contract may sue for its breach unless the contract was made for his benefit." *Sexton v. Taylor Cnty.,* 692 S.W.2d 808, 810 (Ky.Ct.App.1985) (citing *Long v. Reiss,* 160 S.W.2d 668 (Ky.1942)). Only an intended beneficiary, and not an incidental one, can enforce an agreement. *Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.,* 420 F. Supp. 2d 764, 770 (W.D.Ky.2005).  To be an intended beneficiary, a party such as Zachry has to show that the contract was "made for his benefit . . . the mere fact that he will be incidentally benefitted by the performance of the contract is not sufficient to entitle him to enforce it." *Long,* 160 S.W .2d at 673 (citing *Ball v. Cecil,* 148 S.W.2d 273, 274 (Ky.1941)).  "[T]he central issue to determining whether a contract is intended to benefit a third party is the relevant intent of the promisee who purchases the promise from the promisor." *Louisville Gas & Elec. Co.,* 420 F.Supp.2d at 771 (quoting *United States v. Wood,* 887 F.2d 453, 457 (6th Cir.1989)).

The first page of the Air Blower Agreement establishes that the Air Blowers ordered were specifically intended for the Project at the Premises:

Babcock Power Environmental Inc.
and
Siemens Energy, Inc.
Contract Number 100650
Purchase Order Number 446033
Dated May 31, 2013
Oxidation Air Compressors
LG&E/Kentucky Utilities
Mill Creek Station - Unit 3
Louisville, Kentucky
Special Conditions of Purchase

[DE 70-3 at 337].

24

The Air Blower Agreement includes additional references to the Premises and LG&E. *Id.* at 338, 356, 359, and 360-63. Based on the terms of the Air Blower Agreement, this is not a general agreement between Siemens and Babcock for Air Blowers. Rather, the Air Blower Agreement is specifically for Air Blowers for the Project. In fact, the Air Blower Agreement specifically states that "Owner and its EPC contractor shall have to the right to enforce all guarantees and warranties under this Purchase Owner [sic]." [DE 70-3 at 342]. Although these terms are not expressly defined in the Air Blower Agreement, based on the terminology used in the other agreements in this case, "Owner" appears to refer to LG&E and "EPC contractor" to Zachry. Because the Air Blower Agreement was made for Zachry's benefit, Zachry is a third-party beneficiary of it and, as a third-party beneficiary, has privity of contract with Siemens.

### III.   CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1)   The Motion for Summary Judgment by Siemens [DE 70] is **GRANTED IN PART AND DENIED IN PART**.

(2)   The Motion for Summary Judgment by Babcock [DE 71] is **GRANTED IN PART AND DENIED IN PART**.

(3)   Zachry shall have 14 days from issuance of this Order to ratify, join, or substitute the remaining parties in interest in this matter or to show cause why doing so is not required under Fed. R. Civ. P. 17(a)(3).

Rebecca Grady Jennings, District Judge

United States District Court

August 12, 2021

Copies to:      Counsel of record